**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STEVEN A. ROMANO, SR.**, et al., *ADMINISTRATORS OF THE ESTATE OF STEVEN A. ROMANO, JR.*, | **CIVIL ACTION** |
| Plaintiffs, | **NO. 20-1852-KSM** |
| *v.* | |
| **UNITED STATES OF AMERICA,** | |
| Defendant. | |

**MEMORANDUM**

**MARSTON, J.**                                                    **December 15, 2020**

Plaintiffs Steven A. Romano, Sr. and Deborah A. Romano brought this Federal Tort Claims Act lawsuit for medical negligence against Defendant United States of America.  (*See generally* Doc. No. 1.)  The complaint details how their son, Steven Romano, Jr., was admitted to the Corporal Michael J. Crescenz VA Medical Center on October 25, 2017 for treatment for opioid dependence.  (*Id.* at ¶ 19.)  Over the next week his treating nurses and physicians gave him daily doses of methadone, allegedly without his knowing consent and despite the fact that his EKG demonstrated a high QTc interval.[1]  (*Id.* at ¶¶ 20–24, 27.)  During this time, multiple members of the medical staff noted that Romano frequently appeared to be asleep, and even when he was awake, he appeared drowsy and confused and there was unusual swelling in his ankles and feet.  (*Id.* at ¶¶ 30–35, 39, 42.)  Despite these observations, his medical team continued to give him methadone.  (*Id.* at ¶ 40.)  On the night of November 3, 2017, Romano

---

[1] According to Plaintiffs, "Romano was also prescribed other medications that were also potentially sedating and/or could interact with methadone causing cardiac abnormalities, such as a prolongation of the QTc interval, a conduction abnormality that can be associated with sudden death."  (Joint Rule 26(f) Report at p. 2.)

presented as unresponsive and was pronounced dead approximately an hour later.  (*Id.* at ¶ 45.)
The complaint alleges that Romano's death was the "result of cardiorespiratory arrest due to the
combination of medications and dosing administered to him between 10/25/17 and 11/3/17."
(*Id.* at ¶ 50.)

Two years after Romano's death, the Department of Veterans Affairs Office of Inspector
General released the results of its internal investigation, which uncovered multiple issues with
the Medical Center's treatment of Romano.  (*Id.* at ¶ 59.)  According to the complaint, the
investigation found that the facility failed to comply with the relevant consent policies for
methadone treatment, failed to conduct patient observations on rounds, falsified documentation
regarding observations, did not consider possible drug effects and drug-drug interactions
involving methadone, and was not prepared to respond to Romano's cardiopulmonary arrest.
(*Id.*)

On October 22, 2019, the Department of Veterans Affairs formally denied Plaintiffs'
claim, and Plaintiffs timely filed this action on April 9, 2020, alleging that employees at the VA
Medical Center failed to provide proper care and treatment to their son.  (*See generally* Doc. No.
1.)  Plaintiffs are the administrators of their son's estate and in that capacity, sought damages
from the Government pursuant to Pennsylvania's Wrongful Death Act, 42 Pa. Stat. and Cons.
Stat. § 8301, and Pennsylvania's Survival Act, *id.* § 8302.  In July 2020, the parties reached a
settlement in principle, and on October 28, 2020, Plaintiffs filed an Unopposed Petition for Court
Approval and Allocation of Settlement Proceeds.  (Doc. No. 14; *see also* Doc. No. 19.)  For the
reasons that follow, the Court will grant Plaintiffs' unopposed Petition and approve the parties'
proposed settlement and allocation.

I.

Section 3323 of Pennsylvania's Probate, Estates, and Fiduciaries Code requires court approval of any settlement involving claims brought on behalf of or against an estate.  *See* 20 Pa. Stat. and Cons. Stat. § 3323(a); *Schuster v. Reeves*, 589 A.2d 731, 734 (Pa. Super. Ct. 1991) ("The survival action . . . was a claim on behalf of the decedent estate, and it could not be settled without court approval.  Without such approval the attempt to settle and release the estate's claims was ineffective."); *Moore v. Gates*, 580 A.2d 1138, 1141 (Pa. Super. Ct. 1990) ("Before a survival claim can be settled on behalf of a decedent's estate, . . . such a settlement must be judicially approved.").  We have jurisdiction to rule on the appropriateness of the parties' proposed settlement agreement under § 3323(b).  20 Pa. Stat. and Cons. Stat. § 3323(b)(1) ("Whenever it is desired to compromise or settle an action in which damages are sought to be recovered on behalf of an estate, any court or division thereof in which such action is pending and which has jurisdiction thereof may . . . make an order approving such compromise or settlement."); *Moore*, 580 A.2d at 1141 ("Where a survival action is pending, . . . a settlement thereof may be approved by the court in which it is pending . . . .").

"The requirement of court approval of survival actions is intended to protect the estate, as well as the creditors and beneficiaries thereof," and "a court may refuse to approve a settlement of a survival action which is inadequate."  *Moore*, 580 A.2d at 1141; *see also Soares v. McClosky*, 466 F. Supp. 703, 707 (E.D. Pa. 1979) (explaining that § 3323 "serves several substantive ends:  it protects potential beneficiaries, assures that the taxing authority gets its due, and shelters the decedent's representative from subsequent liability by eliciting a judicial determination whether a proposed settlement (or other termination) sufficiently protects the decedent's estate").  "It follows that where wrongful death and survival actions are settled for a

3

single amount, the amount apportioned to the survival action must be approved by a court having jurisdiction." *Moore*, 580 A.2d at 1141.  In approving the proposed settlement, the court may also "approve an agreement for the payment of counsel fees and other proper expenses incident to such action."  20 Pa. Sta. and Cons. Stat. § 3323(b)(1).

We address the adequacy of the proposed settlement before turning to the Plaintiffs' apportionment of settlement funds and attorney's fees.

A.      Adequacy

Section 3323 "contemplates a judicial inquiry into the propriety of a proposed compromise or settlement by the estate, whether or not it is contested, consistent with the court's supervisory jurisdiction over decedents' estates, and an adjudication based thereon."  *Krause v. B&O R.R.*, 33 Pa. D. & C.3d 458, 466 (Pa. Ct. Comm. Pl. 1983); *Tamasy v. Yough Sch. Dist.*, 2:18-cv-01236-NR, 2019 WL 5864893, at *1 (W.D. Pa. Nov. 8, 2019); *see also Moore*, 580 A.2d at 1141 ("[A] court may refuse to approve a settlement of a survival action which is inadequate.").  In performing this inquiry, the court must "exercise independent judgment on the whole case," and decide whether the proposed settlement is "fair and reasonable under the circumstances."  *Krause*, 33 Pa. D. & C.3d at 466 (quotation marks omitted).

Because "[t]he court must independently evaluate the proposed settlement petition," the petition must "provide the court with sufficient information on which to base its determination," including "all relevant facts and the reasons why the administrator of the . . . estate believes the settlement is desirable and why it is in the estate's best interest to settle the action."  *Rodi v. Williams*, Civil Action No. 4:12–1379, 2015 WL 1863006, at *2 (M.D. Pa. Apr. 23, 2015) (quotation marks omitted and alterations adopted).  "Relevant facts include how many medical bills and liens regarding the care of the deceased . . . are to be handled by the settlement."  *Id.*

4

Courts also analyze the strengths and weaknesses of the particular case, including whether the plaintiffs face any "issues of proof that could hamstring their efforts to establish liability" because these issues go to the settlement value of the case. *Tamasy*, 2019 WL 5864893, at *2.

Here, the parties have agreed to settle this case for a total sum of one million dollars. Plaintiffs' counsel and Plaintiffs themselves aver that the proposed settlement is "reasonable" in light of the surrounding circumstances. (Doc. No. 14 at ¶¶ 7–8; *see also* Doc. No. 14-3 at pp. 4–5, Ex. B, Sworn Statements of Steven A. Romano, Sr. & Deborah A. Romano.) *See Tamasy*, 2019 WL 5864893, at *1 ("[The court] gives due regard to the advice of the experienced counsel in this case who recommend the settlement and who have negotiated this settlement at arms-length and in good faith."). Our independent review of the facts confirms that one million dollars is an adequate sum under the circumstances.

First, we note that although the parties conducted minimal discovery and reached a settlement in principle only a couple of months after Plaintiffs filed the complaint in this case, they had a basic understanding of the relevant facts, which were contained in Romano's medical records, and addressed in the Department's internal investigation. (*See* Doc. No. 1 at ¶ 59; *see also* Parties' Joint 26(f) Report at pp. 1–6.) Our own review of the facts alleged in the complaint finds that Plaintiffs have raised numerous, substantial questions about the level of care and attentiveness provided to Romano. But Plaintiffs' claims, while strong, also face potentially significant hurdles related to causation, including Romano's dependence on medically-prescribed narcotics. (*See* Doc. No. 1 at ¶ 19; *see also* Parties' Joint 26(f) Report at p. 2.)

In addition to considering the case's potential strengths and weaknesses, we also consider the costs, economic and emotional, of fully litigating this case. For one, the complaint shows that dozens of Medical Center staff members — attending physicians, psychiatrists, pharmacists,

and nurses — attended Romano and likely have relevant information.  Consistent with this observation, Plaintiffs stated in the Joint Rule 26(f) Report that they intended to conduct 15 to 20 fact depositions.  (*See* Joint Rule 26(f) Report at p. 7 ("Plaintiffs intend to depose 17 witnesses, all of whom are agents or employees of the VA Hospital.  The negligence occurred over a period of days during which 3 psychiatrists and 13 nurses provided direct care to the decedent . . . .").) In addition, the parties anticipated using experts for both liability and damages, and Plaintiffs' Petition shows that they had already retained three experts related to this case.  (*See* Doc. No. 14-3 at p. 25, Ex. H, Costs Expended by McLaughlin & Lauricella, P.C.)  Taken collectively, these facts suggest that fact and expert discovery would have been a long and expensive process, requiring Plaintiffs to relive their son's tragic death over many months.

Finally, we note that there are no "medical bills and liens regarding the care of the deceased" that will need "to be handled by the settlement."  *Rodi*, 2015 WL 1863006, at *2. Medicare has paid no benefits on the decedent's behalf and has no lien against the estate that would need to be accounted for in the settlement.  (Doc. No. 14 at p. 2; *see also* Doc. No. 14-3 at pp. 7–12, Ex. C., Ltr. from Benefits Coordination & Recovery Ctr.)  The Pennsylvania Department of Human Services and Pennsylvania Child Support Program likewise have no liens against Plaintiffs or the estate.  (Doc. No. 14 at ¶¶ 11–13; *see also* Doc. No. 14-3 at pp. 13–21, Ex. D (Ltrs. from Pa. Dep't of Human Servs.), Ex. E (same), Ex. F (Pa. Child Support Program Lien Search Results).)

Under these circumstances, we find that one million dollars is an adequate amount to settle Plaintiffs' claims. *Cf. In re Hughes Estate*, 59 Pa. D. & C.2d 680, 682 (Pa. Ct. Comm. Pl. 1972) ("We have no difficulty in approving the amount of the settlement" because the "risk of

recovering something less than the amount achieved [$284,250] by the settlement was a serious one.").

B.     Apportionment

The parties have proposed apportioning the settlement funds as follows:

| | | | |
|---|---|---|---|
| 1. TOTAL SETTLEMENT | | | $1,000,000.00 |
| | a. | To McLaughlin & Lauricella (counsel fees) | $150,000.00 |
| | b. | To McLaughlin & Lauricella (reimbursement of costs) | $8,318.53 |
| 2. | Balance | | $841,681.47 |
| 3. | Wrongful Death Claim (60%) | | |
| | a. | Deborah and Steven Romano Sr. (Parents of Decedent and Executors) | $505,088.88 |
| 4. | Survival Claim (40%) | | |
| | a. | Deborah and Steven Romano Sr., as Administrators of the Estate of Steven Romano, Jr. | $336,672.59 |

(Doc. No. 14 at pp. 4–5.)  We find this proposed allocation reasonable and fair.

"Pennsylvania cases do not explicitly address settlement allocation formulas," but "Pennsylvania law clearly delineates the requirements to satisfy a wrongful death and survival action award." *Smith v. Sandals Resort Int'l, Ltd.*, 709 F. Supp. 2d 350, 358 (E.D. Pa. Apr. 19, 2010).  "Survival actions under the Pennsylvania Survival Act, 42 Pa. C.S. § 8302, are brought by the administrator of the estate to benefit the decedent's estate."  *Rodi*, 2015 WL 1863006, at *1.  "Survival action damages compensate the decedent's estate for losses from the tort," and account for "decedent's pain and suffering, loss of gross earning power from the date of injury until death, and probable earning during his life expectancy minus the probable cost of

7

maintaining himself and wrongful death damages." *Smith*, 709 F. Supp. 2d at 358. "Survival action proceeds are divided among the heirs of the decedent, either through the decedent's will or by the laws of intestate, regardless of pecuniary loss." *Id.*

By contrast, wrongful death "damages compensate the spouse, children, or parents of decedent for the pecuniary loss, i.e., contributions the decedent would have made for their shelter, food, clothing, medical care, education, entertainment, gifts, and recreation, they would have received from him had the decedent lived." *Id.* at 356. "Pecuniary loss also includes the pecuniary value of the services, society, and comfort the relatives would have received from the decedent." *Id.* Because Pennsylvania policy "favors wrongful death beneficiaries over estate beneficiaries," courts have "approved settlements allocating large percentages to the wrongful death action over the survival action." *Id.* at 358. And "there is nothing inherently suspect or improper about a settlement allocation favoring wrongful death beneficiaries." *Tamasy*, 2019 WL 5864893, at *2–3 (finding allocation of settlement funds reasonable even though the parties allocated the entire amount to the wrongful death claim); *see also Rodi*, 2015 WL 1863006, at *3 (same).

Applying these principles, we find that Plaintiffs' proposed apportionment is a reasonable allocation of the settlement funds. Plaintiffs propose apportioning 40% of the proceeds (after attorney's fees and costs) to their survival claim. The remaining 60% of the net proceeds would go to the wrongful death action and to Plaintiffs as the sole wrongful death beneficiaries. (*See* Doc. No. 1 at ¶ 19.) Although the survival action is allotted a lesser percentage than that given to the wrongful death claim, we note that this is a substantially larger allocation than that approved in *Tamasy* and *Rodi*, where none of the settlement proceeds were apportioned to the survival action. We also believe this smaller percentage is reasonable here because the decedent's pain

and suffering were relatively brief.  He died just a few days after the medical treatment at issue

and was unconscious for a part of that time.  In addition, Plaintiffs have shown that they suffered

pecuniary losses upon his death.  The Petition asserts that the decedent lived with his parents at

the time he died, and had a close, loving, and supportive relationship with them, all of which

they lost upon his death.  (*Id.* ¶ 18.)  Last, as we noted above, there are no outstanding medical

bills or liens that need to be paid out of the estate, and the Pennsylvania Department of Revenue

has stated that it has no objection to the proposed allocation of the gross proceeds of the action.

(Doc. No. 19.)  *Cf. Hammonds v. Luzerne County*, Civil Action No. 3:19-CV-2199, 2020 WL

5517496, at *1 (M.D. Pa. Sept. 14, 2020) (relying on Pennsylvania Department of Revenue's

approval of the proposed allocation).  For those reasons, and in light of Pennsylvania's policy

favoring wrongful death beneficiaries, we conclude that Plaintiffs have proposed a reasonable

allocation of the settlement proceeds between the survival and wrongful death claims.

C.      Attorney's Fees

Last, Plaintiffs propose that $150,000 of the proposed settlement be apportioned to

McLaughlin & Lauricella for attorney's fees and that $8,318.53 be apportioned for legal costs.

(Doc. No. 14 at ¶¶ 15–16.)  The Court finds this apportionment reasonable given that Plaintiffs'

counsel negotiated a fair and equitable settlement of the claims in this case.  In addition, the

Federal Tort Claims Act permits recovery of an attorney's fee as high as 25% of the net

settlement amount, but Plaintiffs' proposed amount is only 15% of the total settlement.  *See* 28

U.S.C. § 2678 (limiting an attorney's fee to no more than 25% of any settlement).

III.

In sum, we find that Plaintiffs' proposed settlement and apportionment of settlement

funds is adequate, fair, and reasonable under the circumstances.  An appropriate order follows.

9